UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Kenya Denise Villines,

      Plaintiff,

      v.                       Civil Action No. 2:16-cv-234-jmc

Nancy A. Berryhill, Acting
Commissioner of Social Security,[1]

      Defendant.

**OPINION AND ORDER**
(Docs. 10, 11)

Plaintiff Kenya Villines brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security denying her application for Supplemental Security Income (SSI).

Pending before the Court are Villines's motion to reverse the Commissioner's decision

(Doc. 10), and the Commissioner's motion to affirm the same (Doc. 11).  For the reasons

stated below, Villines's motion is DENIED, and the Commissioner's motion is

GRANTED.

---

[1] The Court has amended the caption to reflect the current Acting Commissioner of Social Security, who assumed office on January 20, 2017.  *See* Fed. R. Civ. P. 25(d).

**Background**

Villines was 40 years old on her amended alleged disability onset date of February 1, 2013. She dropped out of school in the tenth grade when she was pregnant with her eldest child. (AR 375, 539.) In August 2012, she was taking GED classes twice a week and was enrolled in a drug relapse prevention class, a parenting class, and a computer class. (AR 527.) Villines worked as a security guard for about four years until around 2006. (AR 49, 186, 375, 539.) Before that, she worked as a cashier at various fast food restaurants and at a drug store. (AR 49, 186, 539.) She also worked "under the table doing remode[]ling" until May 2010 (AR 375) and for one-to-two weeks in December 2013, again "under the table," "helping [a] lady clean" rooms (AR 48). In September 2013, Villines was spending "varying amounts of time looking for a job," including a cleaning services job. (AR 564; *see also* AR 565 ("currently looking for work").) She was unable to return to security work because her ex-boyfriend had obtained a restraining order against her, which she stated would be "on her record" for at least two years. (AR 564.)

The record reveals that Villines was physically and emotionally abused, and sexually molested by her stepfather, as a child. (AR 566; *see also* AR 546.) The record further indicates that she was "brutally raped and assaulted" at a young age (AR 537 (raped at age 12); *see also* AR 546 (raped at age 21)), and physically abused by a boyfriend as an adult (AR 377). At the age of 16, she left her mother's home and was placed in a girl's group home. (AR 527.)

2

Villines has a history of drug abuse, and was addicted to cocaine and marijuana for more than 12 years from her early 20s until her early 30s. (AR 538.) In August 2006, she was arrested for selling drugs to an undercover detective; after a week in jail, she was sent to a medical center for outpatient drug and alcohol treatment. (AR 526–27.) In June 2009, she completed two years of mandatory drug and alcohol treatment (AR 526); and in October 2011, she reported having been "sober and drug[-]free for over three years" (AR 376; *see also* AR 527 ("clean for [four] years and [eight] months")). As of March 2013, she reported having been "clean and sober" for seven years. (AR 540.) The record indicates, however, that she "'fell off the wagon' and resumed using cocaine" during the summer and fall of 2013 (AR 754), quitting again on November 12, 2013 (AR 757).

Villines has never been married but lived with the father of her younger son for eight years. (AR 565.) She lived with another man for four years, until he passed away in 2007. (*Id.*; AR 527.) She has two sons but did not raise them because of her problems with substance abuse. (AR 377, 526, 538.) In 2001, she lost custody of one of her sons due to her drug and alcohol abuse. (AR 526.) In October 2011, one of her sons was 16 years old and living with her and her boyfriend, and the other was 22 years old and incarcerated for life. (AR 375, 377, 565.) In February 2012, her younger son was "placed outside the home due to [the Department of Health Services] being involved," coming home to visit Villines on the weekends. (AR 527.) In the summer of 2013, Villines and her boyfriend separated, and she and her son were forced to leave the apartment where the three had been living. (AR 563, 567.)

Due at least in part to her troubled childhood, Villines suffers from several mental health impairments.  She has anger issues and is uncomfortable around crowds or strangers.  (AR 537, 564.)  She has nightmares and poor sleep; she cries easily; she feels sad and hopeless "much of the time"; and her mood is "chronically depressed."  (AR 537; *see also* AR 526.)  She has a long history of depression and anxiety, and has attended therapy sessions since September 2011.  (AR 526, 529, 567 (struggles with "intermittent bouts of depression, typically situationally related, according to her accounts" ).)  Villines also suffers from several physical impairments, including rheumatoid arthritis; hypertension; obesity; and pain in her shoulders, back, hips, and knees.

On a typical day in September 2013 (approximately eight months into the alleged disability period), Villines: attended appointments and ran errands, attended Narcotics Anonymous meetings at least once weekly, regularly attended therapy sessions, occasionally went to the library to search online for a job, worked on her resume, socialized with friends including sometimes going out to eat, watched movies, meditated, and cooked meals for herself and her friend.  (AR 564–65.)  At the September 2014 administrative hearing, Villines testified that she was able to do some chores, including cooking light meals, washing dishes, occasionally dusting furniture, and starting the laundry.  (AR 51–52.)  She stated that her son or other family members completed the remaining chores, which she was physically unable to do.  (AR 53.)  She further stated that she no longer went to the movies but she watched television and read newspapers and magazines.  (AR 59–60.)

In December 2012, Villines applied for SSI, alleging that, starting on June 1, 2010, she had been unable to work due to rheumatoid arthritis, depression, paranoia, posttraumatic stress disorder, attention deficit hyperactivity disorder, and high blood pressure. (AR 169–78, 195.) Her application was denied initially and upon reconsideration, and she timely requested an administrative hearing. The hearing was conducted on September 15, 2014 by Administrative Law Judge (ALJ) Alan Sacks. (AR 40–72.) Villines appeared and testified, and was represented by an attorney. A vocational expert (VE) also testified at the hearing.

Villines testified at the hearing that she can stand, walk, and sit for only 30 minutes at a time, respectively, before needing to switch positions. (AR 55.) She further testified that she has difficulty bending and crouching (*id.*), and has "[c]onstant pain" "all over," including in her hips, back, neck, and knees. (AR 56.) She also testified that she has trouble sleeping (AR 58), and does not usually travel alone because she feels "anxious and uneasy" around crowds (AR 60). Nonetheless, Villines stated that she gets along with people outside of crowds (*id.*) and that her mood is only "a little slightly depressive" (AR 61). Significantly, Villines testified that she would have been able to perform a sedentary job (with some particular limitations) without missing more than two days of work per month up until February 2013. (*See* AR 50 (Villines testifying that if she had been offered a fulltime housekeeping job "early in 2013," she "probably would have" taken it); *see also* AR 62–64.) Given this testimony, on September 19, 2014, Villines amended her alleged disability onset date to February 1, 2013. (AR 185.)

On October 28, 2014, the ALJ issued a decision finding that Villines was not disabled under the Social Security Act at any time from her alleged disability onset date through the date of the decision. (AR 23–35.) Thereafter, the Appeals Council denied Villines's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 5–11.) Having exhausted her administrative remedies, Villines filed the Complaint in this action on August 30, 2016. (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1),

416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the

claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§

404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the

claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant

bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d

at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show

that there is work in the national economy that the claimant can do," *Poupore v. Astrue*,

566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at

step five is limited, and the Commissioner "need not provide additional evidence of the

claimant's [RFC]").

Employing this sequential analysis, ALJ Sacks first determined that Villines had

not engaged in substantial gainful activity since her alleged disability onset date of

February 1, 2013.  (AR 24.)  At step two, the ALJ found that Villines had the following

severe impairments: arthritis, degeneration of the cervical spine, obesity, and depression.

(AR 25–26, 34.)  Conversely, the ALJ found that Villines's heart impairment,

hypertension, kidney injury, ankle injury, and joint pain were non-severe.  (AR 25–26.)

At step three, the ALJ found that none of Villines's impairments, alone or in

combination, met or medically equaled a listed impairment.  (AR 26–30, 34.)  Next, the

ALJ determined that Villines had the RFC to perform "light work," as defined in 20

C.F.R. §§ 404.1567(b), 416.967(b), so long as it "involv[ed] only simple, routine tasks[;]

low stress[;] and low contacts with others."  (AR 32, 34.)  Given this RFC, the ALJ found

that Villines was unable to perform her past relevant work as a cashier or a security

guard.  (AR 33.)  Finally, based on testimony from the VE, the ALJ determined that

Villines could perform other jobs existing in significant numbers in the national

economy, including the jobs of housekeeper and bakery worker.  (AR 33–34, 35.)  The

ALJ concluded that Villines had not been disabled since the amended alleged disability

onset date.  (AR 35.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  A person will be found disabled only if it is determined that his

"impairments are of such severity that he is not only unable to do his previous work[,] but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the

administrative record *de novo* to determine whether there is substantial evidence

supporting the . . . decision and whether the Commissioner applied the correct legal

standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*,

221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of

the Commissioner's decision is thus limited to determining whether "substantial

evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

### Analysis

Villines makes four principal arguments in her Motion: (1) the ALJ failed to adequately assess the severity of Villines's rheumatoid arthritis, anxiety, and hypertension; (2) the ALJ did not correctly evaluate the opinions of examining medical consultant Leonard Popowich, DO; (3) the ALJ's RFC determination was not based on substantial evidence and improperly relied on two Global Assessment of Functioning (GAF) scores; and (4) the ALJ's assessment of Villines's credibility was not based on substantial evidence.  (*See* Doc. 10.)  The Commissioner disagrees with each of these arguments and claims the ALJ's decision is "supported by substantial evidence" and reflects the ALJ's application of "the correct legal standards."  (Doc. 11 at 1.)  As explained below, the Court agrees with the Commissioner and thus affirms the ALJ's decision.

## I.    Step-Two Severity Findings Regarding Arthritis, Hypertension, and Anxiety

Villines argues that the ALJ failed to adequately assess the severity of her

rheumatoid arthritis, hypertension, and anxiety disorder.  It is the claimant's burden to

show at step two that he or she has a "severe impairment," meaning an impairment which

"significantly limits [the claimant's] physical or mental ability to do basic work

activities."  20 C.F.R. §§ 404.1520(c), 416.920(c); *see Bowen v. Yuckert*, 482 U.S. 137,

146 n.5 (1987) ("It is not unreasonable to require the claimant, who is in a better position

to provide information about his own medical condition, to do so.").  An impairment is

"not severe" when medical evidence establishes "only a slight abnormality . . . which

would have no more than a minimal effect on [the claimant's] ability to work."  SSR 85-

28, 1985 WL 56856, at *3 (1985).

The ALJ stated in his decision that Villines's rheumatoid arthritis was a severe

impairment (AR 25–26), noting specifically that it caused Villines "at least one work-

related limitation that is more than minimal" (AR 25).  (*See* AR 34 (listing "arthritis" as

one of Villines's "severe impairments").)  Therefore, Villines's argument that the ALJ

should have found her rheumatoid arthritis to be a severe impairment is mistaken.

Clearly, the ALJ found that that impairment was severe and analyzed it throughout the

sequential evaluation.  (*See, e.g.*, AR 25–26, 30, 32, 34.)  Moreover, Villines's argument

regarding rheumatoid arthritis appears to be based almost exclusively on the mere

diagnosis of this condition.  (*See* Doc. 10 at 3–4.)  It is well settled, however, that the

diagnosis of a condition "says nothing about [its] severity," *Higgs v. Bowen*, 880 F.2d

860, 863 (6th Cir. 1988), and "is not sufficient" to prove disability, *Williams v. Bowen*,

859 F.2d 255, 259 (2d Cir. 1988).  *See McConnell v. Astrue*, No. 6:03-CV-0521, 2008

WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008) ("The mere presence of a disease or

impairment, or establishing that a person has been diagnosed or treated for a disease or

impairment is not, itself, sufficient to deem a condition severe." (internal quotation marks

omitted)).

    In contrast to his finding that Villines's arthritis was severe, the ALJ found that

Villines's hypertension was not severe (AR 25), explaining that the record "does not

indicate any resulting symptoms [from the hypertension] that might cause any work-

related limitations that are more than minimal" (AR 26).  The only facts cited by Villines

to support the claim that her hypertension was severe are that: she had high blood

pressure; her hypertension required emergency room visits and a hospital admission; and

"at one point, her hypertension caused headaches and kidney damage."  (Doc. 10 at 5.)

These facts are insufficient.  Again, merely demonstrating that a condition has been

diagnosed and treated does not establish that it was a severe impairment during the

relevant period.  *See McConnell*, 2008 WL 833968, at *2.  Furthermore, the record

simply does not indicate that Villines's hypertension significantly limited her ability to

perform basic work activities.

    With respect to Villines's anxiety, the ALJ failed to specifically state whether it

was a severe impairment at step two of the sequential analysis.  This failure does not

require remand though, as the ALJ continued through step five of the analysis, explicitly

considering Villines's anxiety and accounting for it in his RFC determination.  *See*

*Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding step-two error

harmless because ALJ considered impairments during subsequent steps); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (same); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two . . . , the question of whether the ALJ characterized any other alleged impairment as severe . . . is of little consequence."). Specifically, the ALJ stated as follows (at step three) with respect to Villines's general psychiatric symptoms, including anxiety:

> The record does not include any psychiatric treatment notes since the alleged onset date. . . . [It] includes evidence [of only] a few dates when [Villines] complained of psychiatric symptoms . . . . On those [dates], [Villines] reported symptoms including . . . anxiety . . . . These notations, however, do not indicate any specific resulting limitations in functioning.

(AR 28.) The record supports these findings. (*See, e.g.*, AR 525–30, 537–41, 563–68.) For example, in March 2013, examining consultant Debra Thompson, PsyD, found that Villines's activities of daily living "are not impaired," and that, "[a]lthough [Villines] would be challenged" to perform a full-time job, "she would be able to manage the stressors inherent in simple[,] ordinary[,] unskilled employment such as she [has done] in the past." (AR 539.) Thus, the Court finds no error in the ALJ's analysis of Villines's anxiety.

Furthermore, as discussed in more detail below, the ALJ incorporated Villines's arthritis, hypertension, and anxiety into his RFC determination by limiting Villines to "light work" involving only "simple, routine tasks"; "low stress"; and "low contact[] with others." (AR 34.) Therefore, the ALJ did not err in his severity findings at step two. *See Woodmancy v. Colvin*, No. 5:12-CV-991 (GLS), 2013 WL 5567553, at *2 (N.D.N.Y.

Oct. 9, 2013) ("[A]s the disability analysis continued and the ALJ considered claimant's severe and non-severe impairments in her RFC determination, any error at step two is, at most, harmless."), *aff'd*, 577 F. App'x 72 (2d Cir. 2014).

## II.    Analysis of Examining Consultant Dr. Popowich's Opinions

Next, Villines argues that the ALJ did not correctly evaluate the March 13, 2013 opinions of examining consultant Dr. Popowich regarding Villines's ability to perform work-related physical activities.  (*See* Doc. 10 at 6 (citing AR 549–50).)  After examining Villines on one occasion, Dr. Popowich made the following opinions: Villines's gait was antalgic on the left; her lower extremities exhibited a limited range of motion; she had difficulty getting on and off the examination table; she could not walk heel-to-toe due to bilateral ankle pain; she had lumbar tenderness and bilateral paravertebral muscle spasm; she could lift 17 pounds but could not carry due to pain in back, knees, and ankles; she could occasionally lift and carry ten pounds; she could sit for only one-and-a-half hours and stand and walk for only up to one hour in an eight-hour workday; and she could occasionally bend, kneel, stoop, crouch, balance, and/or climb.  (AR 548–50.)

The ALJ stated that he "d[id] not rely" on these opinions of Dr. Popowich because (1) they are "based . . . on a single examination," and (2) they are inconsistent with the record "which contains few other . . . abnormal findings and none since [Dr. Popowich's] examination."  (AR 31.)  The Court finds no error.  First, the ALJ correctly noted that Dr. Popowich examined Villines only once.  (*See* Doc. 10 at 6 (Villines stating that Dr. Popowich "conducted *a* physical exam [of her] prior to reaching his conclusions."

(emphasis added)).)  This fact is significant because it means that Dr. Popowich was not a "treating source" under the regulations and thus the ALJ was not required to analyze his opinions under the so-called "treating physician rule."  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[2]  The applicable regulation provides as follows:

> Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source.

20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i).  Applying this regulation, the Second Circuit has held that treating sources who see a patient only once or twice do not have a chance to develop an ongoing relationship with the patient and thus are generally not considered treating physicians.  *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011); *see Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988) (defining a "treating physician" as a physician "who has or had an ongoing treatment and physician-patient relationship with

---

[2]  On January 17, 2017, after the date of the ALJ's decision, several social security regulations regarding the evaluation of medical evidence were revised.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017).  These revisions change the way the Commissioner and the courts review medical and other evidence in SSI and DIB cases in several significant respects.  *Id.* ("The revisions include redefining several key terms related to evidence, revising our rules about acceptable medical sources . . . , revising how we consider and articulate our consideration of medical opinions and prior administrative medical findings, revising our rules about medical consultants . . . and psychological consultants . . . , revising our rules about treating sources, and reorganizing our evidence regulations for ease of use.").  Here, however, the Court applies the earlier regulations that were in effect at the time the ALJ issued his decision on October 28, 2014.  *See Revised Medical Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66138-01, 66178, 2016 WL 5341732 n.1 (Sept. 26, 2016) ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions."); *see also Lowry v. Astrue*, 474 F. App'x 801, 805 n.2 (2d Cir. 2012) (applying regulation in effect at the time of ALJ's decision despite subsequent amendment); *Graham v. Comm'r of Soc. Sec.*, No. 16-CV-142 (LDH), 2017 WL 1232493, at *3 (E.D.N.Y. Mar. 31, 2017) (same).

the individual"). The ALJ properly afforded less weight to Dr. Popowich's opinions based on the fact that Dr. Popowich saw Villines on only one occasion and therefore was not a "treating" physician.

Second, the ALJ's consideration of whether Dr. Popowich's opinions are supported by and consistent with other evidence in the record (*see* AR 31) applies the correct legal standard, given that "[s]upportability" and "[c]onsistency" are important factors for ALJs to consider in determining what weight to assign to medical opinions, 20 C.F.R. §§ 404.1527(c)(3), (4); 416.927(c)(3), (4). *See* 20 C.F.R.§§ 404.1527(b), (c); 416.927(b), (c) (requiring ALJs to "always consider the medical opinions in [the] case record" and to evaluate "every medical opinion" received, whether obtained from treating or consulting sources, considering several "factors," including but not limited to the opinions' supportability and consistency with the record). Moreover, substantial evidence supports the ALJ's finding that Dr. Popowich's opinions are not well supported and are inconsistent with the record. Specifically, Dr. Popowich's opinions are inconsistent with the unremarkable x-rays of Villines's lumbar spine, pelvis, right elbow, hands, and feet (AR 614–15, 736–37, 741, 768, 770, 846–52); the medical opinions of nonexamining agency consultant Sharon Wander, MD (AR 82); and the observations in treatment notes of examining physicians Ralph Riviello, ED (AR 614, 617), Rashid Panahi, MD (AR 736–37), and Karthik Ranganna, MD (AR 741, 768, 770). The treatment records simply do not support the extreme limitations outlined in Dr. Popowich's opinions. The ALJ accurately stated:

> The record includes few abnormal examination findings[;] [Villines's] arthritis apparently is not rheumatoid in nature[;] her depression is not particularly severe[;] her obesity is not particularly severe[;] she has no side-effects from medication[;] she testified to the ability to perform sedentary work through February[] 2013[;] [and] the record does not establish any decline in her medical condition since then.

(AR 30 (citation omitted).)

Thus, the ALJ did not err in declining to rely on the opinions of examining consultant Dr. Popowich.

## III.    RFC Determination

Next, Villines claims the ALJ's RFC determination is not based on substantial evidence.  (*See* Doc. 10 at 6–7.)  Specifically, Villines states that the ALJ "fails to point to any part of the record which supports his finding that she can perform work at the light exertion level."  (*Id.* at 6.)  "In general," however, it is the claimant and not the ALJ who is "responsible for providing the evidence . . . use[d] to make a finding about [his or her] [RFC]."  20 C.F.R. § 416.945(a)(3); *see* 20 C.F.R. § 416.912(c) ("You must inform us about or submit all evidence known to you that relates to whether or not you are . . . disabled."); *Butts*, 388 F.3d at 383 (claimant bears burden of proving case at steps one through four).

The regulations provide that a claimant's RFC is "the most [she] can still do despite [her] limitations," and that the ALJ will assess a claimant's RFC "based on all the relevant evidence in [the] case record."  20 C.F.R. § 416.945(a)(1).  Here, as noted above, the ALJ determined that Villines's RFC was for "light work involving only simple, routine tasks[;] low stress[;] and low contacts with others."  (AR 32, 34.)  The ALJ

explained that this determination was based on his consideration of "the entire record," including the opinions of nonexamining agency consultant Dr. Wander and examining consultant Dr. Thompson, the observations of Villines's treating sources, the objective evidence of record, and Villines's own statements.  (AR 31; *see* AR 26–28, 30, 32.) Substantial evidence supports this determination, and the Court finds no legal error.

Specifically, Dr. Wander opined in April 2013 that Villines could lift/carry ten pounds frequently and twenty pounds occasionally (AR 82); could stand, walk, or sit (with normal breaks) for about six hours in an eight-hour workday (*id.*); and was capable of performing "simple, routine work" (AR 81).  Although Dr. Wander never treated or consulted with Villines, the regulations permit the opinions of nonexamining agency consultants to override those of treating physicians, when the former are more consistent with the evidence than the latter.  *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 567–68 (2d Cir. 1993)) ("[T]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record."); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources.").  Here, the opinions of agency consultant Dr. Warner are more consistent with the record than those of Dr. Popowich, discussed above.  For example, in June 2013, Dr. Riviello observed that Villines's gait was normal; her back and neck exhibited a normal range of motion with no pain, and she demonstrated full muscle strength and a full range of motion throughout her arms and legs.  (AR 614–15.)  And

from June 2013 through February 2014, Dr. Ranganna recorded normal findings

regarding Villines's physical condition, including a normal gait and normal muscle

strength and tone.  (AR 741, 768, 770.)  In March 2014, Dr. Panahi observed that

Villines's gait and stance were normal; her spine exhibited a full range of motion; and

she demonstrated normal muscle strength in her arms and legs.  (AR 736–37.)  X-rays

were also unremarkable during the relevant period.  (AR 846–52.)

    Regarding Villines's mental limitations, the ALJ partially relied on the March

2013 opinions of examining consultant Dr. Thompson (*see* AR 32), who found, as

discussed above, that Villines's activities of daily living were "not impaired," and that

Villines "would be able to manage the stressors inherent in simple[,] ordinary[,] unskilled

employment such as she [has done] in the past" (AR 539).  Dr. Thompson opined that

Villines would have no significant limitations in understanding, remembering, and

carrying out instructions; no significant limitations in responding to changes in a routine

work setting; only slight limitations in interacting with coworkers and supervisors; and no

more than moderate limitations in interacting with the public and responding

appropriately to work pressure.  (AR 541.)  It was proper for the ALJ to rely on the report

of Dr. Thompson even though she was an examining consultant rather than a treating

source.  *See Petrie*, 412 F. App'x at 405 ("report of a consultative physician may

constitute . . . substantial evidence" to support ALJ's decision).  Moreover, nonexamining

agency consultant John Rohar, PhD, assessed limitations similar to those assessed by

Dr. Thompson, including no limitations in understanding and memory and no significant

limitations in carrying out very short and simple instructions, maintaining attention and

concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others, making simple work-related decisions, responding appropriately to criticism from supervisors, and getting along with coworkers.  (AR 84–85.)  Dr. Rohar stated that Villines could perform "simple, routine, repetitive work in a stable environment."  (AR 84.)

Villines argues that the ALJ should not have relied on two GAF scores[3]—a score of 55 assigned in August 2012 and a score of 58 assigned in September 2013—in determining her RFC.  (*See* Doc. 10 at 7–8.)  But the language of the ALJ's decision makes clear that the ALJ did not exclusively, or even primarily, rely on these scores, but rather, considered them as one factor among others reflecting Villines's mental limitations during the relevant period.  (*See* AR 32 ("*To the extent that these scores might be construed as opinions on ability to work*, they do not support a determination of disability." (emphasis added)).)  The ALJ accurately noted that these scores connote only "moderate mental limitation" (*id.*): the DSM-IV states that a score of "51–60" indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers)."  DSM-IV, at 32.  The ALJ did not err in considering these GAF scores as part of his consideration of the record as a whole in

---

[3]  "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'"  *Kohler v. Astrue*, 546 F.3d 260, 262, n.1 (2d Cir. 2008) (quoting *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), at 32 (4th ed. 2000)).

determining Villines's RFC.  *See Leonard v. Comm'r of Soc. Sec.*, No. 5:14-CV-1353

(GTS/WBC), 2016 WL 3511780, at *8 (N.D.N.Y. May 19, 2016) ("[T]he ALJ did not err

in mentioning Plaintiff's GAF score as one factor [in] his overall evaluation of the

medical opinion evidence in the record."), *report and recommendation adopted sub nom.*

*Leonard v. Colvin*, No. 5:14-CV-1353, 2016 WL 3512219 (N.D.N.Y. June 22, 2016).

Furthermore, the ALJ properly determined Villines's RFC in conjunction with

assessing her credibility, as discussed below.  *See Poppa v. Astrue*, 569 F.3d 1167,

1170–71 (10th Cir. 2009).  As the Tenth Circuit explained:

> The regulations require that an ALJ's RFC be based on the entire case record,
> including the objective medical findings and the credibility of the claimant's
> subjective complaints.  Since the purpose of the credibility evaluation is to
> help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC
> determinations are inherently intertwined.

*Id.* (citing 20 C.F.R. §§ 416.929, 416.945); *see also Sitsler v. Astrue*, 410 F. App'x 112,

120 (10th Cir. 2011) ("A proper determination of the weight to be given claimant's

subjective claims of pain and other symptoms underlies a proper finding regarding his

RFC.").

## IV.    Credibility Assessment

The ALJ made a lengthy assessment of Villines's credibility in his decision, listing

"certain important points" that support his finding that she was "less than fully credible."

(AR 30–31.)  For example, the ALJ accurately noted that Villines testified at the

administrative hearing that she last worked for more than a two-week period in 2006 or

2007 (AR 48–49), but the record reveals that she told a consulting psychologist that she

worked "under the table doing remodel[]ing" up until May 2010 (AR 375). And the ALJ

correctly observed that, although Villines testified that she last participated in a drug and

alcohol program in 2009 and 2010 (AR 62), the record indicates that she told a treating

source that she was "very active in [such a] program"—on a "daily" basis—in January

2014 (AR 749). Also, the ALJ accurately stated that Villines testified that she last

engaged in substance abuse, involving cocaine and marijuana, in 2009 and that she did

not recall using cocaine in the year prior to the administrative hearing (September 2013

through September 2014) (AR 61–62, 66); but treatment notes state that she "resumed

using cocaine" during the summer and fall of 2013 before entering "detox/rehab" in

November 2013 (AR 754). The ALJ reasonably explained that "discrepancies" like these

"cast doubt on all [Villines's] statements" and led him to credit Villines's testimony

"only to the extent that the medical evidence supports it." (AR 31.)

It is the province of the Commissioner, not the reviewing court, to "appraise the

credibility of witnesses, including the claimant," *Aponte v. Sec'y of Health & Human

Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal quotation marks omitted), and the court

"must show special deference" to credibility determinations made by the ALJ, "who had

the opportunity to observe the witnesses' demeanor" while testifying, *Yellow Freight

Sys., Inc. v. Reich*, 38 F.3d 76, 81 (2d Cir. 1994). If the ALJ's credibility assessment is

supported by substantial evidence, the court must uphold it, even if substantial evidence

supporting the claimant's position also exists. *Aponte*, 728 F.2d at 591; *see Alston*, 904

F.2d at 126 ("Where there is substantial evidence to support either position, the

determination is one to be made by the factfinder."); *Reynolds v. Colvin*, 570 F. App'x

45, 49 (2d Cir. 2014) ("[W]e will defer to [the agency's credibility] determinations as

long as they are supported by substantial evidence.").

The Court rejects Villines's credibility argument, finding that the ALJ's

assessment of Villines's credibility is supported by substantial evidence.  As noted above,

Villines herself made several statements regarding her work history and drug abuse at the

administrative hearing that are inconsistent with observations made or statements

recorded by her treating providers.  Moreover, the record does not support Villines's

testimony about the severity of her physical and mental impairments.  For example,

although Villines alleged at the administrative hearing that she was in "[c]onstant pain"

"all over" (AR 56), a 2013 consultant report indicates that Villines reported having pain

only "in her back and her ankle" (AR 538) and not to the extent that it affected her

activities of daily living or ability to do household chores like cooking, cleaning, and the

laundry (AR 539).  Additionally, although Villines claims that her anxiety disorder was

severely limiting (Doc. 10 at 7–8), preventing her from traveling alone or being in crowds

(AR 60), a 2012 consultant report states that she "keeps herself busy with positive

activities," including "attend[ing] workshops, classes[,] and therapy" (AR 526), and she

"is proactive [and] advocates for her own needs and seeks out appropriate treatments for

herself" (AR 525).  Furthermore, as the ALJ noted, Villines was able to go shopping, see

friends twice a week, travel on public transportation, and go to the movies during the

alleged disability period.  (AR 29 (citing AR 525–33, 537–44).)

Although Villines attempts to explain her testimony and other statements in a light more favorable to her claim (*see* Doc. 10 at 9–11), the ALJ was not obliged to accept her characterization of the record without question.  *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("[ALJ] is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.").  It is the task of the ALJ, and not the court, to resolve evidentiary conflicts and appraise the credibility of witnesses, including the claimant.  *See Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).  The Court finds no error with respect to the ALJ's assessment of Villines's credibility.

## Conclusion

For these reasons, the Court DENIES Villines's motion (Doc. 10), GRANTS the Commissioner's motion (Doc. 11), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 20th day of July 2017.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge